UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| REMARK HOME DESIGNS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> OAK STREET CONDO PROJECTS, LLC, PAUL ZULEWSKI, JACK WARREN RUNKLE d/b/a RUNKLE ARCHITECTURE, <br><br> Defendant. | Case No. 16-14305 <br> Honorable Laurie J. Michelson <br> Magistrate Judge R. Steven Whalen |

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT OAK STREET CONDO PROJECTS AND PAUL ZULEWSKI'S MOTION FOR SUMMARY JUDGMENT [52], DENYING JACK RUNKLE'S MOTION FOR SUMMARY JUDGMENT [51], AND DENYING AS MOOT REMARK'S MOTION TO STRIKE [57]**

Brian Kramer, who owns Remark Home Designs, prepared the architectural plans for a three-unit condominium building in Wyandotte, Michigan. Adjacent to the three-unit building, foundations were poured to build a four-unit condominium building; but construction halted due to the recession and the property went into receivership. Later, Oak Street Condo Projects, LLC (owned by Paul Zulewski) purchased the four-unit property and hired Jack Runkle as its architect. They also purchased the three-unit architectural plans from the prior owner of the lot. The four-unit site was then built. Believing the four-unit building is a copy of the three-unit building, Remark alleges that Oak Street, Zulewski, and Runkle infringed on its copyright for both the architectural plans and the three-unit building constructed from those plans.

The Defendants disagree and now move for summary judgment.

For the reasons that follow, the Court will grant Oak Street and Zulewski's motion for summary judgment with respect to the constructed building and deny it with respect to the plans. Runkle's motion is also denied.

**I.**

Brian Kramer, an architect, formed Remark Home Designs in 1998. (R. 52-2, PageID.685.)

In 2003, Kramer was approached by Mike Perry, who was interested in purchasing property in Wyandotte, Michigan and building condos on that property. (R. 52-2, PageID.688–689.) A year later, Kramer provided Perry with drawings for a three-unit condominium building. (R. 52-2, PageID.693.) Eventually, the plans were approved by the City of Wyandotte (R. 52-2, PageID.702) and the three-unit building was constructed in the fall of 2016 (R. 52-2, PageID.703).

Around this time, Kramer also drafted plans for an adjoining four-unit building and the foundation was poured. (R. 52-2, PageID.693.) But then the recession hit. (R. 52-2, PageID.703.) The property went into receivership and all plans to further develop the property halted. (*Id.*)

Eventually, Oak Street Condo Projects, LLC purchased the four-unit property. (R. 52-5, PageID.756–757.) Oak Street is owned by Paul Zulewski. (R. 52-5, PageID.755.) Prior to purchasing the property, Zulewski attended a meeting of the Wyandotte Department of Engineering and Building. (R. 52-8, PageID.877.) At that meeting, Zulewski spoke with the City engineer who showed him the site plans they had on file from Remark for the four-unit building. (R. 52-8, PageID.877.) The engineer told Zulewski that the units would have to be built according to those site plans, or he would need to submit new plans. (*Id.*)

Oak Street then began the process of creating architectural plans for the four-unit property. It first reached out to Perry and paid him $1,000 for a copy of Remark's architectural drawings for the three-unit building. (R. 52-5, PageID.757; R. 52-8, PageID.879.) Oak Street then hired Jack

2

Runkle to draft architectural plans for the four-unit site, and he created a set of drawings for that project. (R. 52-5, PageID.758; R. 52-8, PageID.867.) Runkle sent his plans to the City and the City's Planning Commission held two meetings to review those plans. (R. 52-8, PageID.872.) The Planning Commission required several modifications regarding the exterior of the building before approving the plans. (*Id*.)

In 2016, Kramer drove by the property and saw that construction had begun on the four-unit site. (R. 52-2, PageID.705.) He pulled over, spoke with someone at the site and flipped open the plans. (R. 52-2, PageID.705.) After looking at the plans, he drove directly to Wyandotte's Building and Engineering Department and spoke to Claude Marcoux. According to Kramer, Marcoux said, "I suggest you go get an attorney, this is what's called copyright infringement." (R. 52-2, PageID.706.)

So Kramer registered his three-unit drawings for copyright protection. (R. 52-2, PageID.709.) The Copyright Office soon after inquired as to whether the work depicted in the drawings had been built. (R. 52-2, PageID.709.) Kramer responded, and a few months later received "confirmation that the plans, the drawings . . . were copyrighted." (R. 52-2, PageID.710–711.) He then assigned those rights to his company, Remark. (R. 33-3, PageID.443.)

Kramer also sent a notice to Zulewski alleging copyright infringement. At that time, Kramer alleged that all four units copied Kramer's three-unit building. (R. 52-2, PageID.712–713.) After the litigation began, Plaintiff's position changed somewhat. Remark still argues that, in designing and constructing the four-unit building, Defendants copied both the architectural plans and resulting structure of the three-unit building. (R. 33.) But Remark now alleges that only the outer two units of the four-unit building copy the first floor of one unit in the three-unit building and the second floor of another unit in the three-unit building. Kramer testified in his deposition

3

that "the overall form of the floor plans on the end units copy [Plaintiff's plans] to the layout, the spacing planning, the locations of everything, the overall design and functionality of those units." (R. 52-2, PageID.714.) So Remark alleges that Runkle infringed its copyrighted plans, and Zulewski and Oak Street infringed the copyright protected building itself. Remark additionally alleges that Zulewski and Oak Street contributed to Runkle's copyright violation by providing the copyright-protected plans to Runkle and instructing him to copy them.

## II.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Edward*, 241 F.3d 530, 531 (6th Cir. 2001).

"In copyright infringement cases 'granting summary judgment, particularly in favor of a defendant, is a practice to be used sparingly,' but 'a court may compare the two works and render a judgment for the defendant on the ground that as a matter of law a trier of fact would not be permitted to find substantial similarity.'" *Kohus v. Mariol*, 328 F.3d 848, 853 (6th Cir. 2003) (quoting *Wickham v. Knoxville Int'l Energy Exposition, Inc.*, 739 F.2d 1094, 1097 (6th Cir. 1984)).

**III.**

To succeed in a copyright infringement action, a plaintiff must show that he owns the copyrighted work and the defendant copied "protectable elements of that work." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 534 (6th Cir. 2004).

Runkle asserts that Remark cannot establish the first prong of the test. Oak Street and Zulewski assert that Remark cannot establish the second.

The Court starts with Oak Street and Zulewski's motion for summary judgment.

**A.**

**1.**

Copyright protection extends to "architectural works." 17 U.S.C. §102(a)(8); *Frank Betz Assocs., Inc. v. Signature Homes, Inc.*, No. 3:06-0911, 2010 WL 1373268, at *3 (M.D. Tenn. Mar. 29, 2010) ("[A]rchitectural works, as their own subject matter category under the Copyright Act, are unique."). An "architectural work" is defined by the Copyright Act as "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings." 17 U.S.C. § 101. Therefore, "the holder of a copyright in an architectural plan . . . has two forms of protection, one under the provision for an 'architectural work' under 17 U.S.C. § 102(a)(8), and another under the provision for a 'pictorial, graphical, or sculptural work' under 17 U.S.C. § 102(a)(5)." *T-Peg, Inc. v. Vt. Timber Works, Inc*., 459 F.3d 97, 110 (1st Cir. 2006) (quoting H.R. Rep. No. 101-735, reprinted in 1990 U.S.C.C.A.N. at 6950).

The elements of a copyright infringement claim are "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991). For purposes of their summary judgment motion, the Oak Street Defendants focus on the second element. "'Since direct evidence of copying is

rarely available, a plaintiff may establish an inference of copying by showing (1) access to the allegedly-infringed work by the defendant(s) and (2) a substantial similarity between the two works at issue.'" *Tiseo Architects, Inc. v. B & B Pools Serv. & Supply Co.*, 495 F.3d 344, 347 (6th Cir. 2007) (quoting *Stromback v. New Line Cinema*, 384 F.3d 283, 293 (6th Cir. 2004)); *see also Kohus*, 328 F.3d at 853–54. Defendants' access to Plaintiff's work is not disputed. So the essence of the parties' dispute is the issue of substantial similarity.

The Sixth Circuit applies a two-step analysis in determining substantial similarity. "[T]he first step requires identifying which aspects of the artist's work, if any, are protectible by copyright, [and] the second involves determining whether the allegedly infringing work is substantially similar to protectible elements of the artist's work.'" *Stromback*, 384 F.3d at 294 (quoting *Kohus*, 328 F.3d at 855).

The first step involves "filter[ing] out the unoriginal, unprotectible elements—elements that were not independently created by the inventor, and that possess no minimal degree of creativity." *Kohus*, 328 F.3d at 855. "An 'architectural work' . . . includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features." 17 U.S.C. § 101. Thus, architects "get no credit for putting a closet in every bedroom, a fireplace in the middle of an exterior wall, and kitchen counters against the kitchen walls. Furthermore, the overall footprint of the house and the size of the rooms are 'design parameters' dictated by consumer preferences and the lot the house will occupy, not the architect." *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 106 (2d Cir. 2014). "But '[an architect]'s independent selection and arrangement of component parts into an overall, original design generally will be protected.'" *Design Basics, LLC v. Forrester Wehrle Homes, Inc.*, 302 F. Supp. 3d 933, 944 (N.D. Ohio 2018) (quoting *Frank Betz Assocs., Inc. v. J.O. Clark Constr., L.L.C.*, No.

3:08-CV-159, 2010 WL 4628203, at *3 (M.D. Tenn. Nov. 5, 2010)); *see also Frank Betz Assocs.*, 2010 WL 4628203, at *3 ("In the case of more mundane residential designs, it is obvious that the use of porches, porticos, dormers, and bay windows, for example, is not protected, but the particular expression of those ideas, and their combination in one house, may be protected."); *Chirco v. Rosewood Vill. LLC*, 2005 U.S. Dist. LEXIS 43748, (E.D. Mich. Mar. 22, 2005) ("[T]he originality of an architectural work lies not in the mere use of any individual feature or group of features, but in the manner in which those features are arranged."), *report and recommendation adopted in part, rejected in part on other grounds*, 2006 U.S. Dist. LEXIS 70197 (E.D. Mich. Sept. 28. 2006). This "protected level of expression in architectural works often encompasses relatively modest or even mundane design choices." *Forrester Wehrle Homes, Inc.*, 302 F. Supp. 3d at 944.

After filtering out the unprotectible elements, "[s]ubstantial similarity exists where the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." *Stromback*, 384 F.3d at 297 (internal quotations omitted). Put another way, the test is whether "'the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the work's] aesthetic appeal as the same.'" *Forrester Wehrle Homes, Inc.*, 302 F. Supp. 3d at 948 (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960)). "In the end, the question is whether, based upon her 'net impression' of the works' expressive elements, the ordinary lay observer would find them substantially similar to one another." *Design Basics, L.L.C. v. DeShano Cos., Inc.*, No 10-14419, 2012 U.S. Dist. LEXIS 135387, at *18–19 (W.D. Mich. Sept. 21, 2012) (quoting *Stromback*, 384 F.3d at 293).

**2.**

The following deposition exhibit provides a bare-bones, yet helpful, schematic of the two condominium buildings at issue:



(ECF No. 52-5, PageID.785.) On the left is the four-unit building, on the right, the three-unit building. Each unit in the 3-unit building has 3 floors. (*See* ECF No. 52-5, PageID.760.) The units in the 4-unit building are either 2 or 1.5 stories tall. (*Id.*)

With respect to the interior, Remark contends that the first floors of units 217 and 223 in the four-unit building are substantially similar to a number of protectible elements of the first floor of unit 225 in the three-unit building. Remark further asserts that the second floor of unit 217 and 223 in the four-unit building is substantially similar to a number of protectible elements of the second floor of unit 229 of the three-unit building. There are no claimed similarities with respect to units 219, 221, and 227. The Court will now detail the units with alleged similarities.

In unit 225 in the three-unit building (which, again, Remark alleges was reproduced in two units of the four-unit building) Remark identifies the following as protectible elements that were allegedly copied:

- the "inviting" entry, which includes the width of the space, the coat closet just inside the front door, and the nine-foot ceiling;
- the bedroom space which can also be used as an office, which includes an oversized recessed window alcove "that adds character and significant natural light," and two interior closets in opposite corners of the room "giving the room balance and symmetry;" and
- the garage, which includes the "large useful" 20' 10'' deep and 9' 8'' high space.

(R. 52-6, PageID.824–827.)

For the second floor of unit 229 of the three-unit building (which, again, is allegedly reproduced in at least one unit of the 4-unit building),[1] Remark identifies the following protectible elements it believes were copied:

- the "stair top/kitchen/living space," which includes the spatial landing 6' 6'' wide, the open concept kitchen/living/dining room space with an eight-foot ceiling, "all visible from the wide landing at the top of the stairs," the spacious 4' by 2' 2" pantry located right next to the refrigerator and close to the stairs "for ease of access," counter space on either side of the range, sink in front of the window, island that allows for storage and eating space, the "convenience of the kitchen layout contribut[ing] to the overall open living concept embodied in the design," the size, openness and orientation of the

---

[1] As constructed, the second floor of unit 223 is primarily the master suite, which has no parallel in units 225 or 229.

- living/dining room, large window alcove the same width and depth as on the first floor along with the spacing of the two other windows along that wall;
- the bath/laundry/linen closet oriented within a few steps of each other;
- the upstairs bedroom, which includes a cantilever design to extend the rooms two feet longer, the door locations around the corner from the living room to create sound buffering, and a closet between the bedroom and living room to create more sound buffering;
- the master bedroom, which includes a large space 12' 10" long and 11' 5" wide, and two full "bed walls" to ensure "a 'Feng-shui' design, or flow."

(R. 52-6, PageID.828–833.)

In determining whether the ordinary, reasonable observer would find that the overall look and feel of the three-unit and four-unit buildings are substantially similar, the parties appear to agree that a comparison between the *works*, i.e., a building-to-building comparison, is the proper analysis. (ECF No. 52, PageID.671; ECF No. 54, PageID.974–975.)

So the question is whether, taking the protectible elements in the copyrighted work—the three-unit building—and comparing them to the allegedly infringing four-unit building, a reasonable jury could find that "an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the buildings'] aesthetic appeal as the same." *Forrester Wehrle Homes, Inc.*, 302 F. Supp.3d at 948. While this is typically a question for the jury, "in an appropriate case a court may find, as a matter of law, that a trier of fact would not be permitted to find substantial similarity." *Bruemmer v. Reardon*, No. 11-cv-988, 2012 U.S. Dist. LEXIS 169401, at *18 (W.D. Mich. Nov. 29, 2012) (citing *Sturdza v. U.A.E.*, 281 F.3d 1287, 1296 (D.C. Cir. 2002)). On the record before the Court, this is such a case.

Although the inquiry is the overall impression, it is helpful to start by comparing the identified elements in the two floors in isolation. Even assuming they are all protectible, there are notable differences. Starting with the first floor, the coat closet in Defendants' condos is not just inside the front door (behind the front door), it is to the right of the front door. (R. 52-5, PageID.763; *compare* R. 54-1, PageID.998 *with* R. 54-1, PageID.1002.) The first-floor bedroom in Defendants' condo has French doors placed in the middle of the wall, not a single door placed at the end of the wall. (R. 52-5, PageID.763; *compare* R. 54-1, PageID.998 *with* R. 54-1, PageID.1002.) The landing of the staircase in Defendants' condos face the French doors, not the wall. (*Id.*) The ceilings are eight feet tall rather than nine feet. (*Id.*) The bedrooms have different configurations of windows and closets. Upon entering the bedroom in the four-unit building, one sees a window instead of two closets on either side of the wall. (*Id.*) The bedroom is two feet deeper. (*Id.*) The front window alcove is a foot wider and abuts a closet (which flank either side of the French doors) rather than on the other side of the room. (*Id.*)

There are also significant differences in the protectible elements of the second floor. The master bedroom in Defendants' condos has an east-facing window in addition to the sliding glass door, and thus, unlike Remark's second floor master bedroom, does not provide two full "bed walls" to ensure "a 'Feng-shui' design, or flow." (R. 52-5, PageID.765; *compare* R. 54-1, PageID.1000, *with* R. 54-1, PageID.1003.) Defendants' second floors have no stairway to the third floor, as there is no third floor, thus providing space for the washer/dryer and linen closet to fit on that wall. (*Id.*) The ceiling height is again one foot shorter. (*Id.*)

Despite these differences, if the court were to look element-to-element alone, separate floor by separate floor, there may be a question for the jury about substantial similarity. But again, that is not the proper inquiry. The Court must take the protectible elements in the buildings as a whole

11

and consider the overall feel. This would include the middle units of the four-unit building and all of their differences with the three-unit building, including that the middle units do not have a full third-floor as do the condos in the three-unit building. And it would include the differences between the second floor in unit 223 of the four-unit building and the second floors in the three-unit building, and the differences between the first floors of units 217 and 223 in the four-unit building and the first floor of unit 229 in the four-unit building. As well as all of the other differences mentioned by Defendant—such as different ceiling heights, different numbers of floors, and stairways leading to the additional floors. And Remark has not argued why the entire buildings would feel substantially similar even though only two floors of certain units are arguably similar to each other.

Instead, Remark cites *Axelrod & Cherveny Architects* for the principle that "[i]nfringement can be established on the basis of infringing either the floor plans or the exterior, or both." 943 F. Supp. 2d 357, 362 (E.D.N.Y. 2013). In other words, says Remark, it does not need to show both the interior and the exterior were copied to prove infringement. That is true. But as *Axelrod* further explained, "[t]he underlying rationale for this legal proposition . . . is that it is not necessary to prove that every element of the [floor] plans or structure was copied; it is sufficient to show that a *substantial part* was copied.'" *Id.* (emphasis added) (quoting *Richmond Homes Mgmt., Inc. v. Raintree, Inc.*, 862 F. Supp. 1517, 1527 (W.D.Va.1994)); *see also L. Printex Indus. Inc., v. Aeropostale, Inc.*, 676 F.3d 841, 852 (9th Cir. 2012) ("But a copyright defendant need not copy a plaintiff's work in its entirety to infringe that work. It is enough that the defendant appropriated a substantial portion of the plaintiff's work.").

And here, Defendants have established as a matter of law that they did not copy a substantial portion of the interiors of the two buildings. Two of their fours units have no claimed

similarities. As constructed, the second floor of unit 223 of the four-unit building is one large master suite. (ECF No. 52-5, PageID.764.) There is nothing comparable in the 3-unit building. None of the units have a third floor. Remark is alleging only that the first floor of unit 225 and the second floor of unit 229 were copied into the outer units of the four-unit building. That amounts to only two-ninths of the three-unit building. And, as discussed, the floors that were alleged to be copied have significant differences. So, although courts are reluctant to grant summary judgment at the substantial-similarity stage, this Court, left with just elements of two floors in two separate units, finds that no reasonable jury would could find substantial similarity between the look and feel of the two constructed buildings. *See Kohus*, 328 F.3d at 853.

Remark also cannot escape summary judgment by relying on exterior similarities. Remark alleges that the protectible elements of the exterior include "double window opening space symmetrically on both the first and second floors," "alternating vertical elements," three evenly-spaced dormers; the back of the building has brick on the first floor and siding on the second, and "lantern style lighting" to "complement the brickwork." (R. 52-6, PageID.833–834.)

Even assuming that these elements are protectible, no reasonable jury could find that the exterior of the four-unit building is substantially similar to the three-unit building. A review of the "overall form" of the exteriors reveals marked differences between the two buildings. (R. 52, PageID.675.) The four-unit building has no dormers (rooftop windows) and the siding columns extend into a gabled roof. (R. 52-5, PageID.760; *compare* R. 52-5, PageID.781, *with* R. 52-5, PageID.772.) The porches on the front of the four-unit building have gabled roofs as opposed to shed-style roofs in the three-unit building, resulting in more shaker siding visible in the four-unit building and more brick in the three-unit building. (*Id.*) The back porches on the four-unit building are smaller than the porches in the three-unit building (R. 52-5, PageID.762). The overall look of

13

the back is affected by the four-unit building having larger windows next to the porches, and the dormer in the middle of the three-unit building that is absent from the four-unit building (*compare* R. 52-5, PageID.771 *with* R. 52-5, PageID.750.) And the overall look is certainly affected by the inclusion of the middle units in the four-unit building.





Comparing the whole of the exteriors, the Court finds that no reasonable jury could find substantial similarity. *See Kohus*, 328 F.3d at 853.

**3.**

But this is not the end of the analysis. According to Remark, Oak Street and Zulewski's motion should only be considered a motion for *partial* summary judgment because they did not address Remark's contributory infringement claim—that Oak Street and Zulewski contributed to Runkle's infringement of Remark's plans by providing him with those plans and encouraging him to copy them. (R. 54, PageID.968.) In a footnote in their reply, Oak Street and Zulewski respond that their motion addressed all claims "because none of [Remark's] infringement claims survive the absence of substantial similarity." (R. 56, PageID.1031.)

"As [copyright protection extends to both architectural plans and works], it is generally accepted that if a person copies architectural drawings . . . and then builds a house based on the infringing copy, he has infringed the copyright in the original plans both by copying the drawing and by building the house." *Frank Betz Assocs. v. J.O. Clark Constr., L.L.C.*, No. 3:08-cv-00159, 2010 U.S. Dist. LEXIS 53437, at *27–29 n.5 (M.D. Tenn. May 30, 2010). And "the construction of a home that is identical to one depicted in copyrighted architectural plans" could also "infringe upon the architectural work embodied in the physical structure of the original home" even without a claim of infringement of the plans themselves. *Beckwith Builders, Inc. v. Depietri*, No. 04-cv-282-SM, 2006 U.S. Dist. LEXIS 67060, at *37 (D. N.H. Sept. 15, 2006). So, too, one could theoretically claim infringement of its plans even if the resulting structure does not infringe.

Oak Street and Zulewski's argument only addresses the alleged infringement of the constructed building. (*See* R. 52.) They do not discuss the claims regarding infringement of the plans. The footnote in their reply brief simply states that the motion did address that claim. But it

does not explain how or why. And Oak Street's counsel was not fully prepared to address the substantial similarities or lack thereof in the architectural plans during the oral argument. While he argued that he intended the motion to include both infringement of the work and plans, he conceded that that the claims do not rise and fall together. And, as reiterated by Remark's counsel during the motion hearing, it did not have an opportunity to respond to an argument regarding the plans. So the Court is left with no briefing as to why Remark's claim for infringement of the architectural plans fails as a matter of law. And while the argument might be the same as that of the constructed buildings, it might not. In any event, it is not for the Court to make. *See Brenay v. Schartow*, 709 F. App'x 331, 336 (6th Cir. 2017) ("It is not enough for a party to mention a possible argument in the most skeletal way and leave the court to put flesh on its bones." (internal quotations omitted)); *see also Sundberg v. Keller Ladder*, 189 F.Supp.2d 671, 682–83 (E.D. Mich. 2002) ("[I]t is not the office of a reply brief to raise issues for the first time.") (citing *United States v. Perkins*, 994 F.2d 1184, 1191 (6th Cir. 1993)). The Court will not grant summary judgment on Remark's claim based on contributory infringement.

**B.**

The Court now turns to Runkle's motion for summary judgment.

Runkle's sole basis for summary judgment is that Kramer was not the owner of the copyrighted plans. According to Runkle, "Kramer is not the author of the architectural work embodied in the 3 unit building," so "he had no enforceable right to assign" to Remark, and thus, Remark "has nothing to enforce." (R. 51, PageID.621.) In the alternative, Runkle argues that Roderick Warren is the author.

Runkle has not met his summary judgment burden with either argument.

**1.**

Runkle first argues that the architectural plans are a "work for hire" as Kramer created them in his capacity as an employee of Remark.

Authors of a work are initial owners of the copyright. 17 U.S.C. § 201(a). An author "is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Cmty. For Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989).

There is an exception, however, when the work is "made for hire." In that situation, the employer for whom the work was prepared is considered the author unless there is an agreement otherwise. 17 U.S.C. § 201(b).

A "work made for hire" is "a work prepared by an employee within the scope of his or her employment." 17 U.S.C. § 101. To determine whether someone is an "employee" (as opposed to an independent contractor) under the statute, the Court considers general common law of agency and factors such as: the skill required, the source of the instrumentalities and tools, the location of the work, the duration of the relationship between the parties, the extent of the hired party's discretion over when and how long to work, the method of payment, and the tax treatment of the hired party. *Cmty. For Creative Non-Violence*, 490 U.S. at 751.

Runkle argues that because Remark contracted to provide the design work and because Kramer and Remark are distinct legal entities, the plans were a "work made for hire" and Remark is the true author. In support, Runkle attaches an unsigned proposal for Remark to do the architectural work for the three-unit building and points out that the architectural drawings have Remark's, not Kramer's, information on them. (R. 51, PageID.633–639.)

But as Remark points out, this evidence does not necessarily lead to the conclusion that Kramer was Remark's employee such that his work was a "work made for hire" under federal copyright law. Indeed, says Remark, Kramer was the sole member of his LLC and so was neither an employee nor an independent contractor. (R. 53-1, PageID.950.)

In support, Remark cites *Woods v. Resnick*, 725 F. Supp. 2d 809 (W.D. Wis. 2010). In *Woods*, the court found that the relationship between the plaintiff and the LLC was not an agency relationship, like one between employee and employer or even an independent contractor and the employing company. As a co-owner of the LLC, the plaintiff "has an inherent right to control the business." 725 F. Supp.2d at 824. Therefore, the plaintiff was not "under the control of" the LLC. *Id.* (citing *Heimerdinger v. Collins*, 2009 WL 1743764, at *4 (D. Utah 2009); *Brown v. Flowers*, 297 F.Supp. 2d 846, 852 (D.N.C. 2003)); *see also Heimerdinger*, 2009 WL 1743764, at *4 (rejecting similar work-for-hire claim on ground that partners are generally not employees of the partnership); *Brown*, 297 F .Supp. 2d at 852 (plaintiff who alleged in complaint only that he was an equal partner with party asserting copyright ownership did not allege employer/employee relationship and therefore failed to state claim for ownership under work-for-hire doctrine); *M & A Assocs., Inc. v. VCX, Inc*., 657 F. Supp. 454, 459–60 (E.D. Mich. 1987), *aff'd*, 856 F.2d 195 (6th Cir. 1988) ("Buckley was not an employee of Schoolday. Buckley, not Schoolday, was the motivating force in producing the film. He exercised complete control of the corporation, which served as his mere alter ego. There simply was no supervision of his work other than his own. As a result, Buckley owned all rights to the film upon its creation and could transfer those rights to M & A.").

These cases support that Kramer, as the sole member of Remark Home Designs, LLC, owned the rights to the plans and could assign them to Remark. Runkle does not respond to this

18

argument in his reply. (*See* R. 55.) So Runkle has not established, as a matter of law, that Kramer had no enforceable right to assign to Remark.

**2.**

Runkle's second argument does not fare any better.

This argument is based upon Michigan law regulating architects. Under Michigan law, licensed architects must have a seal bearing the architect's name and indicating that the architect is licensed. Mich. Comp. Laws § 339.2007. The licensed architect must apply that seal to any plans he "issues." *Id*. A licensed architect must not apply that seal to any work that is not prepared by that architect or "under the supervision of [the licensed architect] as the person in responsible charge." Mich. Comp. Laws § 339.2008.

Here, Roderick W. Warren affixed his seal to the plans for the 3-unit building. (R. 52-2, PageID.698–699.) So Runkle claims he is the author. But he provides no legal or factual support. As Remark points out, Runkle cites no law to connect Michigan's occupational codes, which provide a regulatory framework for the architectural profession, to who should be considered an "author" under federal copyright law. Under Michigan law, the seal could indicate that Warren "issued" the plans or that they were prepared under his supervision. Runkle provides no legal argument for why Warren should be considered the person "who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Cmty. For Creative Non-Violence*, 490 U.S. at 737. And Kramer testified that he was the one who created the work. Runkle does not contest this fact. So there is no basis to find that Kramer, as the creator of the work, did not properly assign his rights to the plans to Remark.

Runkle is not entitled to summary judgment.

**3.**

The Court notes that, after Oak Street and Zulewski's reply, Remark filed a motion to strike a declaration that was attached to the reply. (ECF No. 57.) The Court did not rely on this declaration in its opinion, and so will deny this motion as moot.

**IV.**

For the reasons stated, Oak Street and Zulewski's motion for summary judgment (R. 52) is GRANTED IN PART AND DENIED IN PART and Runkle's motion for summary judgment (R. 51) is DENIED. Remark's first and third claims remain.

Remark's motion to strike (ECF No. 57) is DENIED AS MOOT.

IT IS SO ORDERED.

>s/Laurie J. Michelson
>LAURIE J. MICHELSON
>UNITED STATES DISTRICT JUDGE

Date: January 30, 2019

### CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on January 30, 2019.

>s/William Barkholz
>Case Manager to
>Honorable Laurie J. Michelson